<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

| | |
|---|---|
| M.B. and K.H. o/b/o J.B., : | |
| : | Civil Action No. 09-5294 (SRC) |
| Plaintiffs, : | |
| : | **OPINION** |
| v. : | |
| : | |
| SOUTH ORANGE/MAPLEWOOD : | |
| BOARD OF EDUCATION, : | |
| : | |
| Defendant. : | |
| : | |

<u>**CHESLER**</u>, District Judge

This matter comes before the Court upon the parties' cross-motions for summary judgment [docket entries 9 & 10]. The Court has considered the papers submitted by the parties in connection with the instant motions, and pursuant to Federal Rule of Civil Procedure 78, rules without oral argument. For the reasons discussed below, the Court denies Defendant's motion for summary judgment [docket entry 9] and grants judgment in favor of Plaintiffs [docket entry 10], pursuant to Federal Rule of Civil Procedure 56(c).

**I.    BACKGROUND**

This matter arises under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400, *et seq*. The grievance involves a determination made in 2007 by the Defendant South Orange/Maplewood Board of Education ("Defendant" or the "School District") that J.B., the minor child of Plaintiffs M.B. and K.H. ("Plaintiffs" or the "parents"), no longer qualified for

special education services under the IDEA. The parents challenged that determination pursuant to the IDEA and New Jersey's implementing regulations in the first instance in an administrative proceeding in the State of New Jersey's Office of Administrative Law. The relevant facts of this action are undisputed, and based on its review of the parties' joint appendix, consisting of the record before the administrative law judge ("ALJ") and his decision, the Court summarizes the facts as follows:

J.B. is presently a 13-year-old girl who resides with her parents, M.B. and K.H., in Maplewood, New Jersey. In 2004, when she was a first-grade student in the public school system of South Orange/Maplewood, J.B. was classified as disabled with a "specific learning disability" under the IDEA by a child study team ("CST") from the School District. The CST based its classification on testing and in-class observations conducted by Adam Price, Ph.D. and Ellen Flamm, LDTC, a psychologist and learning consultant, respectively, of the firm Adam Price & Associates. The evaluation by Price and Flamm had been arranged by J.B.'s parents, and their report (the "2004 Price Report") was accepted by the CST in lieu of conducting an evaluation directed by the School District. The CST determined that J.B. met the IDEA's definition of "specific learning disability" based on the data reported in the 2004 Price Report, which demonstrated that a "severe discrepancy" existed between J.B.'s IQ and her achievement in reading, written expression and mathematical calculation. Thus, on June 9, 2004 the School District CST found J.B. eligible for special education services under the classification of specific learning disability. An individualized education plan ("IEP") was prepared for J.B. for the 2004-2005 school year and, it appears, for each school year thereafter up to and including the 2006-2007 school year. As noted by the ALJ, there is no evidence that Plaintiffs disagreed with the

May 16, 2006 IEP covering the 2006-2007 year, during which J.B. was in fourth grade. It appears from the record that the special education supports called for by that IEP, which included placing J.B. in a resource room for language and math, providing in-class support for science and math and making modifications for standardized testing, were being implemented.

Nevertheless, at the January 18, 2007 re-evaluation meeting among the CST members and J.B.'s parents, the CST determined that J.B. "continues to evidence a learning disability in the following ways: her language art and math continue to be below grade level. She continues to require resource room to address her deficits." (J.A. 106.) It further determined that additional data was needed to determine her continued eligibility and a current evaluation was required.[1]  As in 2004, the School District agreed to accept an evaluation performed by Dr. Price and his firm.

Dr. Price conducted his re-evaluation in January 2007 and prepared a report of his findings and recommendations (the "2007 Price Report"). The 2007 re-evaluation performed by Price and his associates involved a battery of tests to measure J.B.'s neurocognitive abilities but did not include a formal in-class observation of J.B. by the evaluators. The 2007 Price Report notes that J.B. achieved a Full Scale IQ score of 93, measured using the Weschsler Intelligence Scale-IV, placing her in the 32nd percentile. It reported that her scores in the areas of verbal comprehension, perceptual reasoning, working memory and processing speed were all within the

---

[1] The Court notes that New Jersey special education regulations require that a child's eligibility for IDEA educational and related supports be redetermined every three years. N.J.A.C. § 6A:14-3.8.

3

average range. It also reported, however, that based on results from the Woodcock-Johnson III achievement test administered, J.B.'s basic reading and mathematics skills were well below average. According to the 2007 Price Report, J.B.'s broad reading performance was "at the lowest point in the below average range," the 9th percentile, a cluster score covering her performance in three specific areas: letter-word identification, reading fluency and passage comprehension. It found that she was almost two years behind her current grade placement in her broad reading skills and more than two years below grade level in her phonemic awareness skills. Her overall math abilities were similarly low, with the 2007 Price Report noting that she performed at the lowest point in the average range in the various math tests. In the math calculation cluster of tests, her score was below average, putting her at the 18th percentile. In sum, the results of the re-evaluation were mixed. While the 2007 Price Report noted J.B.'s performance was average with regard to areas such as reasoning and oral language abilities, it also noted she was far behind her grade level in reading and math. It placed her at the 9th percentile, below average, in her overall basic academic skills and concluded as follows:

> Her reading performance is low average due to limited reading skills, specifically limited phoneme/grapheme knowledge. [J.B.]'s reading skills range from being two years behind in word identification and sound awareness to being about a year behind when reading passages. Because of her underdeveloped reading skills, [J.B.] can be described as having a Specific Reading Disability (Dyslexia) . . . She is also performing below average in math calculations and as a result, her speed when performing math calculations is below average as well. [J.B.] should continue to receive specialized instruction for reading and math, under the Individuals with Disabilities Education Improvement Act (IDEA). She should receive supplemental resource room assistance for math, and replacement resource room assistance for Language Arts. [J.B.] should continue to receive private instruction in a specialized program for dyslexic children, such as the Orton Gillingham approach.

(J.A. 135 - J.A. 136.)

The 2007 Price Report was provided to the School District on or about May 16, 2007, although her scores on the various Woodcock Johnson academic skills tests were provided sometime thereafter. Pre-dating the School District's receipt of the 2007 Price Report, however, J.B.'s parents delivered an April 23, 2007 letter to the School District expressing their view that J.B.'s academic performance continued to be disappointing despite the best efforts by the School District, that the school lacked the resources to held J.B. progress toward closing the gap, and that they saw no way in which her then-current IEP could be modified to make any appreciable difference. The letter noted that they "reject[ed]" the then-current IEP (which had been adopted on May 16, 2006, upon the parent's consent). The parents stated that, based on these reasons:

> It is our intention to place [J.B.] at the Winston School in September, where their program is specifically designed to meet the needs of children with diagnosed learning differences. We will be seeking reimbursement for tuition and all other costs related to her enrollment, including transportation. Our goal is to resolve this with you as productively and collaboratively as possible.

(J.A. 113.) This letter and other correspondence in the record indicates that J.B.'s parents had independently resolved that their daughter should be removed from the public school system of South Orange/Maplewood and placed at a private school.

The School District and the parents nevertheless went forward with the re-evaluation and IEP process. A June 15, 2007 meeting was convened among J.B.'s parents, her regular and special education teachers, the CST and legal counsel for both the School District and the parents. A document - which was entitled "IEP" but in fact contained no individualized education plan for J.B. - was provided to the parents. It stated that J.B. no longer met the state's

criteria to receive special education services because the results of the re-evaluation demonstrated that she had "netted academic growth." (J.A. 171.) It further stated that her scores on various academic tests not only showed improvement but also placed her in the average range in many areas. The "Statement of Eligibility" concluded that "[b]ased on [J.B.]'s most recent evaluation, her scores were run through the estimator and she no longer meets the criteria for eligible [sic] for special education and related services." (J.A. 174.)

This observation refers to a computer program known as the NJ Estimator 3.0, designed by the New Jersey Department of Education, Office of Special Education. The program, which was not available at the time of J.B.'s initial evaluation, uses a statistical formula to determine whether there is a severe discrepancy between a student's aptitude and her academic achievement. For an explanation of the methodology of the NJ Estimator 3.0 analysis, the Court borrows from the ALJ's summary:

> The parties explain and agree that the NJ Estimator uses a regression analysis to compare a student's aptitude with one achievement test score (W-J III) in an area where it is believed that the student is having difficulty . . . The program instructs that in order to qualify a student for special education, the child study team should be at least 95 percent confident there is a severe discrepancy between a student's expected achievement score and the obtained achievement score.

(J.A. 186 - J.A. 187.) In J.B.'s case, the School District compared J.B.'s verbal comprehension score of 95 from the IQ test to her math calculation score of 86 from the Woodcock-Johnson III achievement tests. This comparison rendered the School District 87% confident that a severe discrepancy existed between J.B.'s aptitude and achievement. Under applicable New Jersey regulations, a school district must be 95% confident that there is a severe discrepancy, which was noted by the summary of discrepancy information prepared by the CST. The summary also noted

6

that for this level of certainty to exist in J.B.'s case, her math calculation score would have to be no higher than 80.

Although not cited in the School District's document declaring J.B. ineligible and giving its reasons therefor, progress reports for J.B.'s fourth grade year are also contained in the record. Teachers' comments on the reports state that J.B. generally had shown improvement. In the identified problem areas of reading and math, the reports consistently grade J.B. no higher than "2" - which corresponds on the report performance key to the observation that "work is accomplished satisfactorily with support." (J.A. 169.)

Following J.B.'s declassification as eligible for special education services, her parents wrote the School District a letter dated July 5, 2007 expressing their disagreement with the declassification and advising that they would place her at the Winston School the following school year. J.B. in fact attended the Winston School for the 2007-2008 and 2008-2009 school years. J.B.'s parents did not file a due process petition challenging her declassification until October 15, 2008. Their due process petition sought reimbursement for the Winston School tuition. The parents and the School District filed cross-motions for summary judgment before the ALJ, who found that there was no dispute of material facts and decided the matter without a hearing and based on the documentary evidence. The School District argued that because J.B. no longer met the criteria for specific learning disability, her IDEA-eligible classification, its determination to declassify her must be affirmed as a matter of law based on N.J.A.C. 6A:14-3.5(c). The parents contended that the School District's decision to declassify J.B. was based solely on the result of the NJ Estimator program and therefore violated the IDEA because the statute does not mention or endorse discrepancy analysis. They also argued that the School

District failed to perform a required in-class evaluation of J.B. prior to making its declassification decision. Finally, the parents claimed that J.B. suffered from dyslexia.

The ALJ found that N.J.A.C. 6A:14-3.5(c), which sets forth the disabilities that will classify a child as eligible for special education and related services, provides that with regard to J.B.'s classification - specific learning disability - the School District may use "'scientifically based intervention methodology as described in N.J.A.C. 6A:14-3.4(h)(6)' in determining whether a specific learning disability exists." (J.A. 191 - J.A. 192 (quoting N.J.A.C. 6A:14-3.5(c)(12)( ii)). Thus, the ALJ found that the School District had correctly relied on the results of the NJ Estimator 3.0 evaluation of J.B.'s scores. He further found that the School District's decision was not based solely on the NJ Estimator results but that the School District had also considered the 2007 Price Report, J.B.'s in-class performance as observed and reported by her teachers and the 2004 Price Report. The ALJ, moreover, rejected the parents' claim that J.B. is dyslexic as insufficiently supported by the record. He observed that Price's conclusion that her underdeveloped reading skills render her dyslexic did not establish as fact that she has dyslexia for purposes of IDEA eligibility. He concluded that the School District was entitled to summary decision in its favor and that it was not obligated to reimburse J.B.'s parents for her tuition at the Winston School.

Plaintiffs filed this action on October 16, 2009 seeking review of the ALJ's decision. The parties have cross-moved for summary judgment.

## II. DISCUSSION

### A. Declassification Determination Under the IDEA

States that receive federal education funding must comply with the requirements of the IDEA. The IDEA mandates that a school district provide a free and appropriate public education ("FAPE") "to all children with disabilities residing in the State between the ages of 3 and 21, inclusive." 20 U.S.C. § 1412(a)(1)(A). The statute defines the term "child with a disability" as a child

> (i) with mental retardation, hearing impairments (including deafness), speech or language impairments, visual impairments (including blindness), serious emotional disturbance . . . , orthopedic impairments, autism, traumatic brain injury, other health impairments, or specific learning disabilities; and
>
> (ii) who, by reason thereof, needs special education and related services.

20 U.S.C. § 1401(3)(A). This action concerns whether J.B. was properly de-classified as disabled within the meaning of the IDEA in 2007, when the School District conducted its triennial review of her eligibility for IDEA special education services, as New Jersey implementing regulations require.

Plaintiffs initiated the action pursuant to the procedure established by 20 U.S.C. § 1415(i)(2)(A) seeking review and reversal of the ALJ's decision. It is essentially an appeal of the administrative decision. The standard of review that a district court must apply in a civil action challenging an IDEA administrative decision has been described as "unusual." *Shore Regional High Sch. Bd. of Educ. v. P.S.*, 381 F.3d 194, 199 (3d Cir. 2004). Unlike judicial review of other agency actions, in which the court is held to a highly deferential standard of review, an action

9

brought under the IDEA requires the district court to conduct a "modified *de novo* review." *S.H. v. State Operated Sch. Dist. of City of Newark*, 336 F.3d 260, 270 (3d Cir. 2003); *Susan N. v. Wilson Sch. Dist.*, 70 F.3d 751, 757 (3d Cir. 1995). Under this standard, the district court must make its own findings by a preponderance of the evidence while at the same time affording "due weight" to the ALJ's determination. *Shore*, 381 F.3d at 199 (citing *Bd. of Ed. of Hendrick Hudson Central Sch. Dist., Westchester Cty. v. Rowley,* 458 U.S. 176, 206 (1982)). "Due weight" means that the district court should consider the ALJ's factual findings to be *prima facie* correct but is not required to adhere to them. *Id.* If the reviewing court fails to adhere to them, it must give reasons for its departure. *Id.* (citing *S.H.*, 336 F.3d at 271.)

For this Court to determine whether the ALJ's decision can be upheld according to the preponderance of the evidence in the record, it must apply the correct burden of proof as to the question that was presented in the administrative proceeding and is before this Court on appeal of the administrative decision. The issue is whether the School District had properly and correctly concluded that J.B. is not eligible for special education under IDEA. The Court, in this regard, feels compelled to point out that this is not a case in which an IEP has been challenged. Indeed, quite to the contrary, the School District determined that J.B. was not eligible for special education services and therefore did not prepare an IEP for her. This action does not, therefore, come within the ambit of the Supreme Court's holding in *Schaffer v. Weast*, which placed the burden of proof on the party seeking relief in an administrative hearing challenging an IEP. *Schaffer v. Weast*, 546 U.S. 49, 62 (2005). The Third Circuit has recognized that after *Schaffer*, the burden of proof falls on the party challenging an IEP. *L.E. v. Ramsey Bd. of Educ.*, 435 F.3d 384, 391 (3d Cir. 2006). It has also recognized that the *Schaffer* holding stands in contrast to but

coexists with the general rule that the burden of demonstrating compliance with the IDEA falls on the school district. *Id.* (citing *Kingwood Twp.*, 205 F.3d at 579 and *Oberti v. Bd. of Educ. of Borough of Clementon Sch. Dist.*, 995 F.2d 1204, 1219 (3d Cir. 1993)). This Court has discovered no Third Circuit case which expressly holds that the burden of demonstrating that a disability classification (or in this case declassification) complied with the IDEA continues to fall on the school district even after *Schaffer*. Nevertheless, guided by the well-settled Third Circuit precedent placing the burden on the school district to prove compliance with the IDEA and the limited holding of *Schaffer* to proceedings in which an IEP has been challenged, the Court holds that the School District bears the burden of demonstrating that it complied with the IDEA in deeming J.B. to be ineligible for special education services for failure to meet the "specific learning disability" classification. *See, e.g., Anello v. Indian River Sch. Dist.*, No. 07-668, 2009 WL 304214, at * 8 (D.Del. Feb. 6, 2009) (holding that *Schaffer* holding applied only to IEP challenged and thus, consistent with Third Circuit precedent, school district bore burden of proof as to plaintiff's claim that it failed to identify their child as eligible for special education in compliance with its "child find" duty under the IDEA).

      In light of this standard, the Court finds that the School District has not met its burden of demonstrating that it properly declassified J.B. Put differently, the record does not support the ALJ's decision to uphold the eligibility determination made by the School District in June 2007.

      The issue before the Court involves application of the IDEA regulation governing determination of a child's eligibility for special education services. That regulation, N.J.A.C. 6A:14-3.5, provides that

11

> A student shall be determined eligible and classified "eligible for special education and related services" under this chapter when it is determined that the student has one or more of the disabilities defined in (c)1 through 14 below; the disability adversely affects the student's educational performance and the student is in need of special education and related services. Classification shall be based on all assessments conducted including assessment by child study team members and assessment by other specialists as specified below.

N.J.A.C. 6A:14-3.5(c). In this case, the School District determined that J.B. no longer qualified for special education services because she did not display the signs of "specific learning disability," one of the fourteen categories of the statutorily-recognized disabilities referenced in the provision quoted above. N.J.A.C. 6A:14-3.5(c)(12). It made this determination using the "severe discrepancy methodology." The regulation authorizes this method. In relevant part, it states:

> i. A specific learning disability can be determined when a severe discrepancy is found between the student's current achievement and intellectual ability in one or more of the following areas:
>
> (1) Basic reading skills;
> (2) Reading comprehension;
> (3) Oral expression;
> (4) Listening comprehension;
> (5) Mathematical calculation;
> (6) Mathematical problem solving;
> (7) Written expression; and
> (8) Reading fluency.
>
> * * *
>
> iv. The district shall, if it utilizes the severe discrepancy methodology, adopt procedures that utilize a statistical formula and criteria for determining severe discrepancy. Evaluation shall include assessment of current academic achievement and intellectual ability.

N.J.A.C. 6A:14-3.5(c)(12)(i) and (iv).

The evidence in the record demonstrates that the information collected in connection with J.B.'s 2007 reevaluation overwhelmingly demonstrates that there was a severe discrepancy between achievement and ability in the areas of reading and math. The 2007 Price Report unequivocally concludes that her skills and performance in those areas are far below what they should be given her grade level and that, based on the evaluators' findings, she should continue to receive specialized instruction for reading and math. J.B.'s progress reports for the 2006-2007 school year preceding her reevaluation and ineligibility determination are consistent with the findings of the reevaluation. They show that she accomplishes her work in reading and math, but only with the educational supports that were then in place. In fact, the School District's own January 2007 report from the reevaluation meeting it conducted to initiate the process of J.B.'s triennial IDEA reevaluation stated that J.B. continued evidence a learning disability insofar as her language and math skills were below grade level. In that report, the school CST further stated that J.B. continued "to require resource room to address her deficits." (J.A. 106.) The only evidence presented to the Court, and to the ALJ below, which militates against a finding of severe discrepancy is the assessment of J.B.'s reevaluation testing data by a computer program, which yielded calculations not considered to evidence the existence of severe discrepancy.

Federal and state special education law prohibit reliance on any one test, formula, or procedure for determining eligibility. 34 C.F.R. § 300.304(b)(2) (directing a school district to use a "variety of assessment tools and strategies" in conducting an evaluation and prohibiting the use of "any single procedure as the sole criterion for determining whether a student is a student with a disability"); N.J.A.C 6A:14-2.5(a) (providing identical requirements as federal regulation).

13

Moreover, regarding the use of severe discrepancy methodology, the applicable regulation makes explicit that although a school district must adopt and use statistical formulas and criteria to determine severe discrepancy, it must also assess the child's academic achievement and ability. N.J.A.C. 6A:14-3.5(c)(12)(iv). This requirement would appear to clarify that even when using a severe discrepancy method for identifying specific learning disability, a school district may not look exclusively to numerical assessments of a child to make its determination. The record likewise indicates that three non-binding letter opinions of the United States Department of Education ("USDOE") - which deal in particular with "specific learning disability" - confirm that a school district may not rely on any single procedure, such as in this case the NJ Estimator, as the sole basis for determining that a child has or does not have a qualifying disability under the IDEA; the policy letters stress that, to the contrary, eligibility determinations require a comprehensive evaluation using a variety of assessment tools. (*See* USDOE Office of Special Education Programs Policy Letters, at J.A.40 - J.A.45.)

Indeed, the ALJ apparently recognized this basic principle in articulating the rationale for his decision. Specifically, he concluded that "the Board did not rush to judgment based solely on the Estimator results. Rather, it considered evaluations performed in 2004 and 2007; it considered J.B.'s in-class performance; and, it did consider the result obtained through application of the NJ Estimator 3.0 computer program." (J.A. 192.) The ALJ's determination that the School District properly made its declassification determination in consideration of

various factors is frankly not supported by the record.[2]  The School District's only stated basis for declassifying J.B., according to the June 15, 2007 document declaring her to be ineligible for special education services, was that "her scores were run through the estimator," which showed she did not meet eligibility criteria. (J.A. 174.)  Indeed, as set forth above, the other reevaluation information presented a child who in 2007 was struggling in the basic areas of math and reading, even in spite of receiving special education supports such as in-class assistance and resource room time since her 2004 classification.  There is no dispute that, according to the record, the NJ Estimator analysis of J.B.'s reevaluation test scores indicated that the discrepancy between J.B.'s achievement and her abilities was not severe enough to warrant continued classification as specific learning disabled.  The NJ Estimator results are, however, but one factor in the reevaluation and, moreover, at odds with the other reevaluation assessments.  While the Court does not conclude, nor do the parties argue, that the computer program is not a tool at the disposal of a school district, the law is clear that determining whether a child is disabled under the IDEA must be based on more than a formula-driven numerical assessment of a child.

---

[2] In providing guidance on the application of the modified *de novo* review standard, the Third Circuit Court of Appeals has instructed that a district court must consider but not necessarily accept administrative factual findings.  *Carlisle Area Sch. v. Scott P.*, 62 F.3d 520, 529 (3d Cir. 1995).  It has, moreover, distinguished documentary evidence from testimony in the record, opining that determinations based on the latter are due "special weight." *Shore*, 381 F.3d at 199.  Such deference is undoubtedly predicated upon the ALJ's superior ability to evaluate the credibility of witnesses.  In this case, however, the determination under review by the Court was made by the ALJ in the context of cross-motions for summary judgment, without a hearing.  In the absence of credibility issues, the ALJ's factual analysis is at best entitled to substantially lesser deference than it would be had he dealt with live witness testimony. *See, e.g., Carlisle*, 62 F.3d at 530 n.4 (observing that lessened deference owed to administrative findings that do not turn on credibility judgments).

The Court reiterates that the burden is on the School District to demonstrate by a preponderance of the evidence that it complied with the IDEA in declassifying J.B. The record is simply insufficient to carry that burden.

It is true that, according to the IDEA, classification as disabled is only the first of three criteria that must be fulfilled before a child may be deemed eligible for special education services. Still, having improperly determined that J.B. no longer classified as specific learning disabled, the School District cannot as a matter of law meet its burden of demonstrating that it complied with the IDEA in declaring J.B. to be ineligible for special education services. The School District's motion for summary judgment must therefore be denied. Moreover, for the reasons discussed above, the Court finds that the J.B.'s parents are entitled to judgment on the claim that J.B. was unlawfully deemed ineligible for special education services.

### B.     Relief Under IDEA

In making an eligibility determination contrary to the IDEA, the School District deprived J.B. of a FAPE. Plaintiffs are, therefore, entitled to some remedy. The IDEA authorizes the Court to grant the prevailing party "such relief as court deems appropriate" to remedy the deprivation of a FAPE. 20 U.S.C. § 1415(i)(2)(C)(iii); *Ferren C. v. Sch. Dist. of Phila.*, — F.3d. — , No. 09-1587, 2010 WL 2735716, at *3 (3d Cir. July 13, 2010). While the statute does not prescribe specific remedies, the jurisprudence makes clear that a court should order an equitable remedy tailored to the particular circumstances and deprivations a case may present. *Ferren C.*, 2010 WL 2735716, at *3-4. In their Complaint, J.B.'s parents pray for a variety of equitable remedies, including ordering the School District to reimburse them for expenses associated with

placing their child at the Winston School, to consider J.B. eligible for special education services, to prepare an IEP stating that her current placement is the Winston School and to prospectively fund all costs for J.B. to remain at the Winston School.

The Court, at this point, refrains from ordering any of the relief prayed for by Plaintiffs in the Complaint and/or any other relief as the Court may ultimately find is justified to remedy the particular FAPE deprivation affecting J.B. The parties have not briefed the issue of relief at all, and in the absence of their input regarding what would constitute appropriate equitable relief in this case, the Court lacks adequate information to make such a decision. The Court will reserve decision on the matter of remedy to afford the parties an opportunity to submit their positions in writing to the Court. The Court will accept further briefing, limited to the issue of what remedy would be appropriate to redress the IDEA violation discussed in this Opinion. The Court expects the parties to address, among other relevant matters, the delay between the ineligibility determination and the initiation of due process proceedings, reasonable reimbursement for past private placement expenses, and the application of the IDEA's stay-put provision, 20 U.S.C. § 1415(j). The parties should support their positions with any legal authority, affidavits and/or documents they believe to be relevant. Moreover, the Court will state in its order that such supplemental briefing on the issue of the appropriate IDEA remedy for Plaintiffs will not be construed as a waiver, by either side, of the right to appeal this Court's disposition of the cross-motions for summary judgment.

## III. CONCLUSION

For the foregoing reasons, this Court will grant summary judgment in favor of Plaintiffs, and deny the School District's motion for summary judgment. The Court will reserve decision on the award of relief, affording the parties an opportunity to make supplemental submissions to the Court on that issue. An appropriate form of order will be filed together with this Opinion.

  s/Stanley R. Chesler<br>
  STANLEY R. CHESLER<br>
  United States District Judge

DATED: August 3, 2010